REICH v. SCHMIDT.

1. CANCELLATION OF INSTRUMENTS—FRAUD—SUFFICIENCY OF EVIDENCE.

 The determination of the court below that the owner of certain corporate stock and the broker who acted as his agent in exchanging a one-half interest therein for equities in two parcels of real estate were guilty of fraud, *held*, supported by the record.

---

[1]Cancellation of Instruments, 9 C. J. § 195.

2. SAME—PLEADING—PARTIES JOINED AS DEFENDANTS NOT ENTITLED
   TO AFFIRMATIVE RELIEF WHERE NOT ASKED FOR.

   Where the assignees of the contract interest in a parcel
   of real estate, out of which plaintiffs had been defrauded,
   did not file a cross-bill or ask for affirmative relief in the
   suit against their assignors, in which they were joined as
   defendants, they were not entitled to a decree requiring
   plaintiffs to join in the assignment to them, since the issue
   so covered was not before the court.

3. SAME—VENDOR AND PURCHASER—FRAUD — VENDEES MAY NOT
   PROFIT BY FRAUD ALTHOUGH ACTING IN GOOD FAITH.

   The vendees in a subcontract, who paid $1,000 for an
   equity of about $4,300, out of which the vendees in the
   original contract had been defrauded, should not be allowed
   to profit by said fraud, although they acted in good faith
   in so purchasing, and, therefore, on appeal, the decree is
   modified so as to protect them only as to the amount
   actually paid, on condition that the monthly payments
   remain at $100 instead of $125 as provided in their sub-
   contract.

4. APPEAL AND ERROR—DECREE MODIFIED.

   Where a decree affirming an assignment of plaintiffs'
   equity in real estate, out of which they had been de-
   frauded, and giving them a decree for $4,500 against the
   broker who defrauded them is modified, on appeal, by
   restoring to them said equity except as to $1,000 which
   the assignees paid therefor, the amount awarded against
   the broker is reduced to $3,500 to conform thereto.

5. EQUITY—FRAUD—PRINCIPAL MAY NOT USE AGENT'S TRICKERY AS
   SHIELD.

   Where a husband and wife, who were defrauded out of
   an equity in real estate, were induced by the agent of the
   perpetrator of the fraud, in whom they had confidence,
   to participate in a fraudulent scheme on others, the pur-
   pose and legal effect of which they did not understand, he
   may not excuse his fraudulent conduct on the ground
   that they do not come into court with clean hands, since the
   principal may not use his agent's trickery as a shield.

Appeal from Wayne; Brennan (Vincent M.), J.

[2]Cancellation of Instruments, 9 C. J. § 182; [3]Id., 9 C. J. § 235;
[4]Appeal and Error, 4 C. J. § 3170; [5]Equity, 21 C. J. § 176.

Submitted October 12, 1927. (Docket No. 41.) Resubmitted March 27, 1928. Decided April 3, 1928.

Bill by Ernest F. Reich and another against Herman A. Schmidt, Thomas B. Redmond and others to set aside an exchange of property on the ground of fraud. From the decree rendered, plaintiffs and defendants Redmond appeal. Modified and affirmed.

*Kinnane & Leibrand,* for plaintiffs.

*Harold D. Warren,* for defendants Redmond.

NORTH, J. In this case the plaintiffs, who are husband and wife, are seeking to have a transaction set aside whereby they exchanged their contract interest in two pieces of Detroit real estate on the basis of $7,500 for a one-half interest in the stock holdings of the defendant Thomas B. Redmond in the Lapeer Pressed Steel Axle Company, a Michigan corporation. The parcel of real estate referred to as the Seneca avenue property was plaintiffs' homestead. The other parcel was located on Fourteenth avenue in Detroit. The plaintiffs had sold this parcel on a subcontract to Mrs. Elinor M. Nettleton, and their interest in it was the difference between the amounts unpaid on these respective contracts, which was approximately $4,300. The defendant Herman A. Schmidt, a real estate broker, was authorized by Redmond to dispose of his interest in the axle company. As the result of an advertisement which Schmidt placed in the paper, he was brought into contact with the plaintiffs. After some negotiations between the plaintiffs and the defendant Thomas B. Redmond, which for the most part were carried on through Schmidt, the plaintiffs assigned their two equities in the Detroit properties to Redmond. At the outset of these negotiations Redmond had placed the price of $15,000 on his interest in the axle company. When it developed that the

plaintiffs did, not have sufficient property or means with which to purchase the whole of this interest, Schmidt arranged to join with them as a partner for the purpose of carrying on the business, and agreed that he would purchase for cash one-half of Redmond's interest on the basis of $7,500, the same as the plaintiffs were purchasing the other one-half interest for. About the time the deal was closed with the plaintiffs, Schmidt produced a receipt signed by Redmond from which it appeared that the latter had received the $7,500 from Schmidt. Redmond's stock in the Lapeer Pressed Steel Axle Company and all of his interest in this company were thereupon transferred to Mr. and Mrs. Reich and Schmidt by a bill of sale dated April 12, 1923. A schedule attached to this bill of sale contained an itemized list of the property transferred, including a patent covering the pressed steel axle which the plaintiffs and Schmidt were supposed to manufacture. At the same time the deal was closed with Redmond, an agreement was signed between plaintiffs and Schmidt whereby they became joint owners of Redmond's interest in the Lapeer Pressed Steel Axle Company. The plaintiffs gave possession of their home property to Thomas B. Redmond and wife and delivered to him the papers which evidenced their interest in the Fourteenth avenue property. Soon after taking possession, Mr. and Mrs. Redmond conveyed their interest in the homestead property to their son, Arthur J. Redmond. Through a real estate agent, the interest of the Redmonds in the Fourteenth avenue property, which, as before stated, amounted to substantially $4,300, was transferred to the defendant Dios M. Curtright for $1,000. The agent claimed he had bought this contract interest of Redmond for $500. In any event each had one-half of the $1,000 paid. The plaintiffs, after closing the deal, moved to Lapeer where the axle manufacturing plant was

located.    The factory had not been operated for some time, and Mr. Reich made an effort to get it into condition to resume manufacturing operations.    It had been arranged or understood between the plaintiffs and Schmidt that the latter could and would secure funds with which to finance the renewed operations in manufacturing the patented steel axles.    The plaintiffs were buoyed along for weeks by communications from Schmidt, but nothing of the expected co-operation ever developed.    The plaintiffs finally found themselves in straitened circumstances financially, whereupon Mr. Reich began work as a painter and his wife secured employment in a millinery shop.    Further efforts to consummate the plan with Schmidt seemed hopeless and useless and were abandoned.    In the meantime plaintiffs had learned of the alleged fraudulent character of the transaction as hereinafter detailed, and they filed their bill of complaint in September, 1923, asking that the transfer be set aside and their property restored, or, in the event restoration was impossible because of intervening rights of innocent third parties, the plaintiffs asked that they be decreed damages for the loss they had sustained because of the fraud perpetrated.

The trial judge found the defendants Schmidt and Thomas Redmond had deceived and defrauded the plaintiffs as alleged in the bill of complaint.    It is particularly stated in the opinion filed by the circuit judge, notwithstanding the representations of these two defendants to the contrary, that because prior to this transaction the corporate powers of the Lapeer Pressed Steel Axle Company had been suspended its stock was worthless; that the representation of Redmond to the plaintiffs that the company's assets were worth $30,000 was false and at the time of making such representation he must have been aware of the falsity thereof; that the patent which plaintiffs were

led to believe was worth $40,000 was about to expire, and for that and other reasons was practically valueless; that the liabilities of the axle company were many times the amount of its assets; that the receipt from Redmond to Schmidt for $7,500 "seems to have been established beyond all doubt" to have been a "fake receipt." A review of the record satisfies us that the circuit judge was correct in his determination that the plaintiffs were defrauded by Schmidt and Redmond and because of this the plaintiffs are entitled to the relief sought as against Schmidt and the Redmonds. Neither Mary Redmond, the wife of Thomas Redmond, nor their son, Arthur J. Redmond, has any *bona fide* rights in the real estate which the plaintiffs seek to have restored.

In holding that the plaintiffs are entitled to the relief granted in the circuit, we have not overlooked the defendants' claim that these parties dealt with each other at arm's length; that whatever statements were made by Schmidt or Redmond were merely expressions of opinion as to future prospects of this axle manufacturing business and a legitimate "boosting" on their side of the transaction; or the fact that the plaintiffs inspected the Lapeer plant before the deal was closed, and that they endeavored for some time to carry out the plan involved in the transaction. The circuit judge found the plaintiffs were people below average intelligence, and clearly they were far from being the equals of Schmidt and Redmond in cleverness and shrewdness. That they were the victims of a frame-up between Schmidt and Redmond is quite beyond question. Notwithstanding the contention to the contrary, the plaintiffs were entitled to the restoration of their interest in the Seneca avenue property, and a decree for $500 damages against Thomas B. Redmond as repayment of the amount he received incident to the sale of plaintiffs' interest in the Fourteenth avenue

property.   A money decree for $4,500 was entered in favor of the plaintiffs against the defendant Herman A. Schmidt as damages which plaintiffs had sustained by reason of the loss of their interest in the Fourteenth avenue property.   Schmidt has not appealed.

The plaintiffs have appealed from the portion of the decree wherein the trial judge denied restoration to the plaintiffs of their property interest in the Fourteenth avenue property on the ground that Dios M. Curtright and Esther M. Curtright were innocent *bona fide* purchasers for value of the contract interest formerly held by the plaintiffs in this property.   The plaintiffs have also appealed from that part of the decree which provides that the plaintiffs shall "join in an assignment of said Balmer (plaintiffs' vendor) contract" to the defendants Curtright.   Clearly this latter provision of the decree was not justified.   The Curtrights did not file a cross-bill nor did they ask for affirmative relief of any kind.   The issue covered by this part of the decree was not before the court, and it must be set aside for that reason as well as for other reasons hereinafter indicated.   *Village of Trenton* v. *Rucker,* 162 Mich. 19 (34 L. R. A. [N. S.] 569) ; *McManus* v. *City of Petoskey,* 164 Mich. 390.

As hereinbefore stated, the Fourteenth avenue property was sold on a subcontract by the plaintiffs to Elinor M. Nettleton, and she ·in turn sold it on another subcontract to the defendants Curtright on June 7, 1922.   A real estate agent named Bogan sold to the Curtrights for $1,000 the contract interest in the Fourteenth avenue property which the plaintiffs had previously transferred to Redmond.   This transaction in effect cut the Reich contract and Mrs. Nettleton's contract out of the chain of contracts covering this property, and put into the hands of the Curtrights for a consideration of $1,000 the former contract equity of the plaintiffs which on the face of the papers

amounted to approximately $4,300. While we think the proofs justified the conclusion of the circuit judge that the Curtrights purchased this equity in good faith still the record presents the question as to what extent they should be allowed to profit by the fraud which Schmidt and Thomas B. Redmond perpetrated on the plaintiffs. It should be borne in mind that the Curtrights were not misled into purchasing the Fourteenth avenue property because of anything for which the plaintiffs are responsible. The Curtrights had already bought and occupied these premises. They did not buy the contract in which plaintiffs were vendees until May 14, 1923. They were made parties defendant to the amended bill of complaint filed September 21, 1923; and we find nothing in the record which shows they did anything which will be to their disadvantage or prejudice because of having attempted to acquire this second contract interest, except they paid the consideration of $1,000 therefor. They should be protected in this expenditure of $1,000 by having it credited on the Reich-Nettleton contract, through which they should acquire this property if they secure title to it at all. They should be held to be vendees under this contract. If this is done, the Curtrights will neither gain nor lose as the result of the fraud through which Redmond or Bogan were able to offer the prior contract for sale to the Curtrights. This is the result that should be obtained, because it restores to the plaintiffs their property rights in the Fourteenth avenue property as far as can be done without injury to innocent third parties. It is true that this solution of this controversy would compel the Curtrights to pay at the rate of $125 per month instead of $100 per month, as provided in their contract from Mrs. Nettleton; but the relief sought by the plaintiffs as to the Fourteenth avenue property will be granted only on condition the monthly payments to be made by the Curtrights are reduced to $100 per month.

And further, in order that the relief granted may be consistent, the decree taken in accordance with this opinion should reduce the amount of the damages decreed to the plaintiffs against the defendant Herman A. Schmidt from $4,500 to $1,000, which amount under this determination of the case represents plaintiffs' total loss incident to the Fourteenth avenue property.

It is claimed by the defendant Redmond that the plaintiffs were active participants in a fraudulent scheme whereby the contract price of the Fourteenth avenue property was raised from $13,500 to $14,000 and the monthly payments were increased from $100 to $125, and that because of this irregularity and fraudulent conduct the plaintiffs are not in court with clean hands and should be denied any relief. We agree with the circuit judge that whatever part the plaintiffs had in this manipulation was wholly without knowledge of its purpose or legal effect, and that they acted under the guidance of Schmidt because of confidence reposed in him. Schmidt was the agent of Redmond, and the principal should not be allowed to use the agent's trickery as a shield.

The decree may be modified to conform to the foregoing opinion and entered in this court. The plaintiffs will have costs of this court against the appellants, Thomas B. Redmond, Mary Redmond, and Arthur J. Redmond.

FEAD, C. J., and FELLOWS, WIEST, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred.